WO            IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

MICHAEL PARSONS,
           Plaintiff,
       vs.
CAROLYN W. COLVIN, acting Commissioner, Social Security Administration,
           Defendant.

No. 2:14-cv-1878-HRH

O R D E R

This is an action for judicial review of the denial of disability benefits and child's insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Plaintiff has timely filed his opening brief,[1] to which defendant has responded.[2] Oral argument was not requested and is not deemed necessary.

Procedural Background

Plaintiff is Michael Parsons. Defendant is Carolyn W. Colvin, acting Commissioner of Social Security.

---

[1]Docket No. 10.

[2]Docket No. 11.

In August 2010, plaintiff filed applications for child's insurance benefits and Title II disability benefits. Plaintiff alleged disability beginning on January 1, 2002. Plaintiff alleged that he is disabled because of arrhythmia, postural orthostatic tachycardia syndrome (POTS), orthostatic intolerance, and autonomic instability. Plaintiff's applications were denied initially and upon reconsideration. After a hearing on August 30, 2012, an administrative law judge (ALJ) denied plaintiff's claims. On June 25, 2014, the Appeals Council denied plaintiff's request for review, thereby making the ALJ's October 19, 2012 decision the final decision of the Commissioner. On August 22, 2014, plaintiff commenced this action in which he asks the court to find that he is entitled to child's insurance benefits and disability benefits.

## General Background

Plaintiff was born on August 11, 1982. He was 30 years old at the time of the hearing. At the time of the hearing, plaintiff lived in a house with his mother. Plaintiff graduated from high school and completed two years of college. Plaintiff had an IEP while in junior high and high school. Plaintiff worked for three or four months as a technician in an arcade; he worked for his mother at her store; and he worked at his high school one summer in the computer department.

Plaintiff was "evaluated for an arrhythmia beginning in 1990. After prolonged lethargy, headaches and inability to concentrate, in 1993 [plaintiff] was diagnosed with [a]

seizure disorder. Despite numerous trials of medications [plaintiff's doctors were] not ... able to get these problems under good control."[3] In 1999, plaintiff was diagnosed with POTS after a tilt-table test.[4]

## The ALJ's Decision

The ALJ first determined that plaintiff "had not attained age 22 as of January 1, 2002, the alleged onset date, but did so on August 10, 2004...."[5] The ALJ next found that plaintiff "last met the insured status requirements of the Social Security Act on June 30, 2003, based upon his earnings."[6]

The ALJ then applied the five-step sequential analysis used to determine whether an individual is disabled.[7]

---

[3]Admin. Rec. at 292.

[4]Admin. Rec. at 320.

[5]Admin. Rec. at 20.

[6]Admin. Rec. at 20

[7]The five steps are as follows:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
> Step two: Is the claimant's alleged impairment sufficiently severe to limit ... h[is] ability to work? If so, proceed to step three. If not, the claimant is not disabled.
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R.,

(continued...)

At step one, the ALJ found that plaintiff had "not engaged in substantial gainful activity since January 1, 2002, the alleged onset date.... For purpose of the Title II application, the claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 2002 through his date last insured of June 30, 2003...."[8]

At step two, the ALJ found that "[p]rior to attaining age 22 and through the date of last insured, the claimant had the following severe impairment: hyperadrenergic postural orthostatic tachycardia syndrome...."[9]

At step three, the ALJ found that "[p]rior to attaining age 22 (August 10, 2004) and through the date last insured (June 30, 2003), the claimant did not have an impairment or

---

[7](...continued)
        pt. 404, subpt. P, app. 1?  If so, the claimant is disabled. If not, proceed to step four.
        Step four: Does the claimant possess the residual functional capacity ("RFC") to perform ... h[is] past relevant work?  If so, the claimant is not disabled. If not, proceed to step five.
        Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow ... h[im] to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

[8]Admin. Rec. at 20.

[9]Admin. Rec. at 21.


combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1...."[10]  The ALJ considered Listing 4.05 (recurrent arrhythmias).

Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's RFC."  Bray v. Comm'r Soc. Sec. Admin., 554 F.3d 1219, 1222-23 (9th Cir. 2009). The ALJ found "that both prior to attaining age 22 (August 10, 2004) and through the date last insured (June 30, 2003), the claimant had the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a)."[11]

The ALJ found plaintiff's symptom statements less than credible because plaintiff received no medical treatment during 2002-2004, because plaintiff lives a fairly active lifestyle, because plaintiff is able to adjust his activity level in order to prevent more serious symptomology, and because plaintiff can perform all of his activities of daily living without assistance.[12]

The ALJ gave minimal weight[13] to Dr. Goodman's opinion.[14]  The ALJ gave little

---

[10] Admin. Rec. at 21.

[11] Admin. Rec. at 21.

[12] Admin. Rec. at 23.

[13] Admin. Rec. at 23.

[14] Dr. Goodman was a doctor at the Mayo Clinic, and on April 21, 2012, he opined that plaintiff could occasionally and frequently lift/carry less than 10 pounds, could stand/walk
(continued...)

weight[15] to the testimony of plaintiff's mother.[16]

At step four, the ALJ found that plaintiff had no past relevant work.[17]

At step five, the ALJ found that "there are jobs that exist in significant numbers in the national economy that the claimant can perform...."[18] This finding was based on the Medical-Vocational Rule 201.27.[19]

Thus, the ALJ concluded that plaintiff "has not been under a disability, as defined in the Social Security Act, at any time prior to August 10, 2004, the date he attained age 22" and that he "was not under a disability, as defined in the Social Security Act, at any time

---

[14](...continued)
less than 2 hours per day, could sit for less than 6 hours, could never climb or stoop, and could occasionally crouch, kneel, and crawl. Admin. Rec. at 395-396. Dr. Goodman wrote that plaintiff "has postural tachycardia syndrome. With prolonged standing, walking or with changes in position, he experiences symptoms of lightheadedness, fatigue, cognitive impairment. Patient has blood pressure instability. The symptoms are disabling to patient and make it difficult to complete activities of daily living." Admin. Rec. at 399. On April 23, 2012, Dr. Goodman opined that plaintiff was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods of time, travel in unfamiliar places, and use public transportation; and was markedly limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Admin. Rec. at 401-402.

[15] Admin. Rec. at 24.

[16] On January 5, 2011, Dianne Parsons, plaintiff's mother, completed a third-party function report. Admin. Rec. at 241-250.

[17] Admin. Rec. at 24.

[18] Admin. Rec. at 24.

[19] Admin. Rec. at 25.

from January 1, 2002, the alleged onset date, through June 30, 2003, the date last insured...."[20]

## Standard of Review

Pursuant to 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner...." The court "properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)). "'To determine whether substantial evidence supports the ALJ's decision, [the court] review[s] the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'" Id. (quoting Andrews, 53 F.3d at 1039). If the evidence is susceptible to more than one reasonable interpretation, the court must uphold the Commissioner's decision. Id. But, the Commissioner's decision cannot be affirmed "'simply by isolating a specific quantum of supporting evidence.'" Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999)).

---

[20]Admin. Rec. at 25.

Discussion

Plaintiff first argues that the ALJ erred in finding that he did not meet Listing 4.05. In order to meet Listing 4.05, a claimant must have a recurrent arrhythmia, such as tachycardia,

> not related to reversible causes ... resulting in uncontrolled (see 4.00A3f), recurrent (see 4.00A3c) episodes of cardiac syncope or near syncope (see 4.00F3b), despite prescribed treatment (see 4.00B3 if there is no prescribed treatment), and documented by resting or ambulatory (Holter) electrocardiography, or by other appropriate medically acceptable testing, coincident with the occurrence of syncope or near syncope (see 4.00F3c).

The ALJ found that plaintiff did not meet this listing because there were no "findings based on diagnostic, clinical, and/or objective evaluations, including reports of laboratory tests and diagnostic imaging, consistent with the level of severity that meets the criteria under the Listings."[21] The ALJ also noted that "no examining or treating physician or medical provider reported findings since the alleged onset date that meet the criteria under the Listings."[22]

Defendant argues that the ALJ did not err in finding that plaintiff did not meet Listing 4.05 because plaintiff does not have uncontrolled recurrent episodes of cardiac syncope or near syncope. Near syncope is "a period of altered consciousness, since syncope

---

[21] Admin. Rec. at 21.

[22] Admin. Rec. at 21.

is a loss of consciousness or a faint. It is not merely a feeling of light-headedness, momentary weakness, or dizziness." 20 C.F.R. pt. 404, subpt. P, app. 1, § 4.00(F)(3)(b). Defendant contends that there is no evidence in the record of syncope or near syncope, let alone uncontrolled and recurrent syncope. Defendant points out that in 1999, plaintiff sought treatment for lightheadedness[23] and that in August 2008, he denied episodes of syncope.[24]

Contrary to defendant's contention, there is evidence in the record of syncope, and there is also evidence of presyncope. In 1995, it was noted that plaintiff had 4-5 episodes of syncope per month[25] and in August and September 2008, it was noted that plaintiff had presyncope.[26] This was documented with the tilt-table test, which was coincident with the occurrence of near syncope. The August 24, 1999 tilt-table test "showed immediate orthostatic vasovagal response noted with Isoproterenol with heart rate dropping to 60 and positive symptoms of dizziness and light headedness. A heart rate rise in the baseline state is also suggestive of hypovolemia."[27] And in 2006, the testing that Dr. Low did at the Mayo Clinic showed "orthostatic intolerance compatible with POTS without evidence of

---

[23] Admin. Rec. at 320.

[24] Admin. Rec. at 365.

[25] Admin. Rec. at 305.

[26] Admin. Rec. at 361 & 365.

[27] Admin. Rec. at 320.

autonomic failure."[28] Because these diagnostic tests are consistent with the level of severity that meets the criteria under Listing 4.05, the ALJ erred in finding that plaintiff's impairments did not meet Listing 4.05.

Plaintiff next argues that the ALJ erred in failing to consider whether his impairments equaled Listing 11.02, which is the listing for convulsive epilepsy. "If a claimant fails to prove that []he meets a particular listing but is able to provide sufficient medical findings of equal or greater significance and relating to the same impairment, then the ALJ is to consider the issue of equivalence." James v. Apfel, 174 F. Supp. 2d 1125, 1129 (W.D. Wash. 2001). "Equivalence is determined on the basis of a comparison between the symptoms, signs, and laboratory findings of the claimant's impairment, or combination of impairments, with the medical criteria shown with the listed impairment." Id. "A determination of equivalency requires the testimony of a medical expert." Id.

Listing 11.02 is the listing for

> convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment. With:
>
> A. Daytime episodes (loss of consciousness and convulsive seizures) or
>
> B. Nocturnal episodes manifesting residuals which interfere

---

[28]Admin. Rec. at 346.

significantly with activity during the day.

Defendant argues that because plaintiff never made this argument to the ALJ, the court cannot consider it. "An ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." Burch v. Barnhart, 400 F.3d 676, 683 (9th Cir. 2005). The claimant must offer some plausible theory as to how his combined impairments are medically equal to a listed impairment. Id.

Plaintiff's counsel presented no argument at the hearing that plaintiff's impairments medically equaled Listing 11.02, but she did make such an argument to the Appeals Council.[29] And, plaintiff offered evidence to support a plausible theory that his impairments equaled Listing 11.02, including evidence from the doctors that first treated him in 1990 and 1991 and evidence from the cardiologists who were treating him in 2008 and 2010.[30] It was error not to consider whether plaintiff's impairments equaled Listing 11.02.

Plaintiff next argues that the ALJ failed to explain her RFC assessment. The RFC must contain "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8p, 1996 WL 374184, at *7. Plaintiff takes issue with the

---

[29] Admin. Rec. at 283-284.

[30] Admin. Rec. at 285-288, 365-366 & 379-382.

fact that in assessing his RFC, the only portion of the medical record that the ALJ discussed was Dr. Goodman's opinion, to which the ALJ gave only minimum weight. Defendant contends that the ALJ had no medical evidence to discuss because there was no medical evidence in the record for the relevant period (January 1, 2002 through August 2004).

There was, however, pre-2002 medical evidence and post-August 2004 medical evidence, which the ALJ did not discuss but which was relevant here given the nature of plaintiff's illness. Moreover, the ALJ repeatedly pointed out that there was no medical evidence from the relevant time period, but the ALJ did nothing to rectify the problem. The ALJ "has an independent 'duty to fully and fairly develop the record.'" Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir.2001) (quoting Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996)). "This duty exists even when the claimant is represented by counsel." Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983). This duty is triggered if there is ambiguous evidence or if the record is inadequate to allow for proper evaluation of the evidence. Mayes v. Massanari, 276 F.3d 453, 459–60 (9th Cir. 2001). The lack of medical evidence from the relevant time period triggered the ALJ's duty to more fully develop the medical record before assessing plaintiff's RFC.

Finally, plaintiff argues that the ALJ erred in finding his symptom statements less than credible. "An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." Garrison v. Colvin, 759 F.3d

995, 1014 (9th Cir. 2014). "'First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). "In this analysis, the claimant is not required to show 'that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.'" Id. (quoting Smolen, 80 F.3d at 1282). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" Id. (quoting Smolen, 80 F.3d at 1282). "If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" Id. at 1014-15 (quoting Smolen, 80 F.3d at 1281). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" Id. at 1015 (quoting Moore v. Comm'r of Soc. Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002)). "In evaluating the claimant's testimony, the ALJ may use 'ordinary techniques of credibility evaluation.'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Turner v. Comm'r of Social Sec., 613 F.3d 1217, 1224 n.3 (9th Cir. 2010)). "For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained

failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.]" Id. (internal citations omitted). "While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting[.]" Id. at 1112-13 (internal citations omitted). "Even where those activities suggest some difficulty [in] functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Id. at 1113.

The ALJ found plaintiff's symptom statements less than credible because plaintiff received no medical treatment during 2002-2004, because plaintiff lives a fairly active lifestyle, because plaintiff is able to adjust his activity level in order to prevent more serious symptomology, and because plaintiff can perform all of his activities of daily living without assistance.[31] Plaintiff argues that these were not clear and convincing reasons.

As for the first reason, that he received no medical treatment between 2002-2004, plaintiff argues that the ALJ did not understand that POTS is a permanent and basically unchanging condition. Plaintiff seems to be suggesting that there was no reason for him to

---

[31]Admin. Rec. at 23.

receive medical treatment,[32] particularly since the primary treatment from doctors consisted of advice to drink more water and eat more salt.[33] While an "ALJ is permitted to consider lack of treatment in h[er] credibility determination[,]" Burch, 400 F.3d at 681, SSR 96-7p cautions ALJs to not draw negative inferences from a claimant's failure to seek medical treatment if "[t]he individual [has been] advised by a medical source that there is no further, effective treatment that can be prescribed and undertaken that would benefit the individual." 1996 WL 374186, at *8. Thus, this was not a clear and convincing reason to find plaintiff's symptom statements less than credible.

As for the second reason, that plaintiff leads a fairly active lifestyle, the ALJ specifically noted that plaintiff was enrolled in and attending college and obtained numerous credit hours, was able to graduate from high school, and exercised.[34] Plaintiff points out however that the evidence shows that in 1995 he missed almost an entire month

---

[32] Plaintiff also contends that he did not receive any treatment during this time because he had no medical insurance. Plaintiff contends that he testified as much at the hearing, but the record does not bear this out. Plaintiff testified that he did not see any doctors during that time period because it was difficult to find doctors who understood POTS and that his mom had been the one to help him do so, but during this time period he was living in Phoenix and his parents were still living in Chicago. Admin. Rec. at 68.

[33] Admin. Rec. at 320, 349, 356 & 362-363.

[34] Admin. Rec. at 23.

of school and had trouble completing his work because he was gone so much[35] and that his college transcripts show that he dropped seven classes, failed nine classes, and got Ds in four classes.[36] Plaintiff argues that this evidence hardly shows that he had a successful college career.

Defendant disputes plaintiff's reading of his college transcript, but regardless of how many classes plaintiff failed or dropped during his time in college, the ALJ's second reason was not clear and convincing. The record as a whole shows that attendance was a major problem for plaintiff while he was in school and plaintiff's current exercise is that he tries to use his recumbent bike "somewhere between twice a week and every two weeks[.]"[37] This evidence does not suggest that plaintiff would be able to maintain a full-time job.

As for the third reason, that plaintiff is able to adjust his activity level in order to prevent more serious symptomology, plaintiff does not dispute that he can do this. But, this ability does not render plaintiff's symptom statements less credible. Rather, the adjustments that plaintiff has to make in order to control his symptoms strongly suggest that he would have difficulty maintaining a full-time job.

As for the fourth reason, that plaintiff can perform all of his activities of daily living

---

[35]Admin. Rec. at 195 & 293.

[36]Admin. Rec. at 206-207.

[37]Admin. Rec. at 65.

without assistance, there is evidence, besides plaintiff's, to the contrary. In 1995, Dr. Sheinkop noted that plaintiff's "seizures leave Michael so fatigued he is unable to participate in the activities of daily life."[38] Plaintiff's mother testified that plaintiff has trouble with some issues of personal grooming, that she pays many of his bills for him, takes him shopping, fills his prescriptions for him, and that he has help with yardwork.[39] And, Dr. Goodman noted that plaintiff had difficulties completing activities of daily living.[40] This was not a clear and convincing reason to find plaintiff's symptom statements less than credible.

Because the ALJ erred in finding plaintiff not disabled, the court must consider whether to remand this matter for an award of benefits or for further proceedings. "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004). "Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits." Id.

> More specifically, the district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are

---

[38] Admin. Rec. at 292.

[39] Admin. Rec. at 242-245.

[40] Admin. Rec. at 399.

-17-

>no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Id.

Because the ALJ erred in finding that plaintiff's impairments did not met Listing 4.05, a remand for benefits is appropriate here. But even if the ALJ did not err at step three, a remand for benefits would still be appropriate because the ALJ erred in finding plaintiff's symptom statements less than credible. If plaintiff's testimony were credited as true, he would be disabled. Although there is no testimony from the vocational expert that if plaintiff's testimony were credited as true he would be disabled, this is one of those "unusual case[s] in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy, even though the vocational expert did not address the precise work limitations established by the improperly discredited testimony, remand for an immediate award of benefits is appropriate." Id. at 595.

## Conclusion

Based on the foregoing, the Commissioner's decision is reversed and this case is remanded for an award of benefits.

DATED at Anchorage, Alaska, this 2nd day of June, 2015.

/s/ H. Russel Holland
United States District Judge